IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ORTHOBOND CORPORATION, | Case No |
| *Plaintiff*, | |
| v. | Honorable |
| MARC H. BUREL, | |
| RANDELL "RANDY" CLEVENGER, PH.D., | **JURY TRIAL DEMANDED** |
| GORDON D. DONALD, M.D., | |
| CHEOLJIN "CJ" KIM, PH.D., and | |
| MOLECULAR SURFACE TECHNOLOGIES, LLC | |
| *Defendants*. | |

## COMPLAINT AND JURY DEMAND

Plaintiff Orthobond Corporation ("Plaintiff" or "Orthobond"), by and through its attorneys, hereby files this Complaint against Defendants Marc H. Burel ("Burel"), Randell "Randy" Clevenger, Ph.D. ("Clevenger"), Gordon D. Donald, M.D. ("Donald"), Cheoljin "CJ" Kim, Ph.D. ("Kim"), and Molecular Surface Technologies, LLC ("MST") (collectively, "Defendants"), and alleges and avers as follows:

## NATURE OF THE ACTION

1.      This is an action for misappropriation of trade secrets in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*, misappropriation of trade secrets in violation of the New Jersey Trade Secrets Act ("NJTSA") N.J. Stat. Ann. §§ 56:15-1 *et seq.*, as well as unfair competition and breach of contract under New Jersey common law, all relating to Defendants' misappropriation of Plaintiff's confidential and proprietary business information, know-how and trade secrets.

**THE PARTIES**

2.      Plaintiff Orthobond Corporation is a biotechnology corporation organized and existing under the laws of the State of Delaware, with its headquarters and principal place of business located at 1 Deer Park Drive, Monmouth Junction, New Jersey, 08852.

3.      Defendant Marc H. Burel is an adult individual.  Upon information and belief, Mr. Burel currently resides in Perkasie, Pennsylvania.  Burel served as Vice President and Chief Operating Officer of Orthobond, as well as President and Chief Executive Officer of Orthobond, until his employment was terminated on August 31, 2017.  Upon information and belief, following his termination at Orthobond, on or around January 31, 2018, Burel was identified as a "general partner" in incorporation documents for defendant MST, a biotechnology corporation that, upon information and belief, is located at 100 Jersey Avenue, Suite A360/Box A10, New Brunswick, New Jersey 08901, and that directly competes with Orthobond in the surface treatment technology space.[1]  Upon information and belief, in or around April 2018, Burel was appointed as the Chief Executive Officer of MST.  Upon information and belief, Burel "is responsible for all core business functions of MST and is MST's primary coordinator with active and potential corporate partners to bring their technology to a fully commercialized product."[2]  Burel executed an Employment Agreement with Orthobond effective December 31, 2010 ("2010 Burel Agreement," attached hereto as Exhibit 1), and, upon information and belief, through the commission of acts described below, is in violation of the terms of the Employment Agreement which remained in effect following his termination.

---

[1] *See* https://mosutech.com/.
[2] *See* https://mosutech.com/front-page/leadership-team/.

4.      Defendant Randell Clevenger, Ph.D. is an adult individual.  Upon information and belief, Dr. Clevenger currently resides in Plainfield, New Jersey.  Clevenger was Senior Vice President of Research and Development at Orthobond until his employment was terminated on November 30, 2017.  Upon information and belief, following his termination at Orthobond, Clevenger cofounded MST, where he currently serves as the Chief Scientific Officer.[3] Clevenger executed an Employment Agreement with Orthobond effective April 24, 2006 ("2006 Clevenger Agreement," attached hereto as Exhibit 2), and, upon information and belief, through the commission of acts described below, is in violation of the terms of the Employment Agreement which remained in effect following his termination.

5.      Defendant Gordon Donald, M.D. is an adult individual.  Upon information and belief, Dr. Donald currently resides in Oceanport, New Jersey.  Donald was Co-Chairman of the Scientific Advisory Board at Orthobond until his employment was terminated in or around August 2017.  Upon information and belief, following his termination at Orthobond, Donald cofounded MST as the original founder and principal.  Upon information and belief, Donald "co-manages business development at MST and is responsible for interfacing all scientific and business functions."[4]  Donald executed an Advisory Board Agreement with Orthobond effective January 1, 2014 ("2014 Donald Agreement," attached hereto as Exhibit 3), and, upon information and belief, through the commission of acts described below, is in violation of the terms of the Employment Agreement which remained in effect following his termination.

6.      Defendant Cheoljin "CJ" Kim, Ph.D. is an adult individual.  Upon information and belief, Dr. Kim currently resides in North Brunswick, New Jersey.  Kim was Senior

---

[3] *Id.*

[4] *Id.*

3

Principal Scientist at Orthobond until his employment was terminated in or around August 2018. Upon information and belief, following his termination at Orthobond, Kim joined MST as Director of Chemistry, where he works on developing antimicrobial surface technology.[5] Kim executed an Employment Agreement with Orthobond effective October 10, 2011 ("2011 Kim Agreement," attached hereto as Exhibit 4), and, upon information and belief, through the commission of acts described below, is in violation of the terms of the Employment Agreement which remained in effect following his termination.

7.    Defendant Molecular Surface Technologies, LLC is a Delaware limited liability company with its principal place of business located in New Brunswick, New Jersey.  On information and belief, MST was founded by at least Donald, Burel and Clevenger, and Donald, Burel, Clevenger and Kim are currently employed by MST.

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction over Orthobond's claims.  This action involves claims arising under the DTSA, 18 U.S.C. § 1836 *et seq.*  This Court has original jurisdiction of such actions under 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c).  This Court also has supplemental jurisdiction over the pendant state law claims pursuant to 28 U.S.C. § 1367.

9.    This Court has personal jurisdiction over each of the Defendants.

10.    This Court has personal jurisdiction over Burel because, *inter alia*, (i) he has done and continues to do business in New Jersey, including regularly doing or soliciting business and engaging in other persistent courses of conduct, and/or deriving substantial revenue from goods and services provided to individuals in New Jersey and in this judicial district, at least through his conduct as CEO of MST which is located in New Jersey; (ii) he has acquired, used, and/or

---

[5]  *Id.*

4

disclosed Orthobond's confidential and proprietary business information, know-how and trade secrets in New Jersey and in this judicial district; and (iii) he agreed and consented in Section 8 of the 2010 Burel Agreement, and in other agreements discussed below, that the state and federal courts located in the State of New Jersey have exclusive jurisdiction over all disputes arising under or related to the aforementioned agreements.

11. This Court has personal jurisdiction over Clevenger because, *inter alia*, (i) he resides in New Jersey and within this District; (ii) he has done and continues to do business in New Jersey, including regularly doing or soliciting business and engaging in other persistent courses of conduct, and/or deriving substantial revenue from goods and services provided to individuals in New Jersey and in this judicial district, at least through his conduct as Chief Scientific Officer of MST which is located in New Jersey; (iii) he has acquired, used, and/or disclosed Orthobond's confidential and proprietary business information, know-how and trade secrets in New Jersey and in this judicial district; and (iv) he agreed and consented in the 2006 Clevenger Agreement, Attch. A, Section VI, that the state and federal courts located in the State of New Jersey have exclusive jurisdiction over all disputes arising under or related to the aforementioned agreement.

12. This Court has personal jurisdiction over Donald because, *inter alia*, (i) he resides in New Jersey and within this District; (ii) he has done and continues to do business in New Jersey, including regularly doing or soliciting business and engaging in other persistent courses of conduct, and/or deriving substantial revenue from goods and services provided to individuals in New Jersey and in this judicial district, at least through his conduct as principal and co-manager of business development at MST which is located in New Jersey; (iii) he has acquired, used, and/or disclosed Orthobond's confidential and proprietary business information, know-how

5

and trade secrets in New Jersey and in this judicial district; and (iv) he agreed and consented in Section 14 of the 2014 Donald Agreement that the state and federal courts located in the State of New Jersey have exclusive jurisdiction over all disputes arising under or related to the aforementioned agreement.

13.     This Court has personal jurisdiction over Kim because, *inter alia*, (i) he resides in New Jersey and within this District; (ii) he has done and continues to do business in New Jersey, including regularly doing or soliciting business and engaging in other persistent courses of conduct, and/or deriving substantial revenue from goods and services provided to individuals in New Jersey and in this judicial district, at least through his conduct as Director of Chemistry at MST which is located in New Jersey; (iii) he has acquired, used, and/or disclosed Orthobond's confidential and proprietary business information, know-how and trade secrets in New Jersey and in this judicial district; and (iv) he agreed and consented in the 2011 Kim Agreement, Attch. A, Section VI, that the state and federal courts located in the State of New Jersey have exclusive jurisdiction over all disputes arising under or related to the aforementioned agreement.

14.     This Court has personal jurisdiction over MST because it resides within this District, with its principal place of business located in New Brunswick, New Jersey.  MST regularly conducts business within this District from its principal place of business, and solicits funding and investments from within this District.  Furthermore, MST has established minimum contacts within the forum such that the exercise of jurisdiction over Defendants will not offend traditional notions of fair play and substantial justice. Upon information and belief, MST maintains commercial websites accessible to residents of the State of New Jersey and this District, through which MST promotes its purported technology and solicits funding and investments. For example, MST's website, https://mosutech.com, is accessible to consumers and

investors within the United States, including those in the State of New Jersey and this District, where MST supplies information about its products and technology.

15.    Venue is proper in this District under 28 U.S.C. § 1391(b) because, as described herein, all or at least a substantial part of the events giving rise to Orthobond's claims occurred within this District, and continue to occur within this District.  Venue is also proper in this District under 28 U.S.C. § 1391(b) because, as described above, Clevenger, Donald, Kim and MST reside in this District, and Burel, Clevenger, Donald, Kim and MST are subject to the Court's personal jurisdiction with respect to this action.  Burel, Clevenger, Donald and Kim have also consented to venue in this District pursuant to their Employment Agreements, as described above.

## BACKGROUND

### A.    Orthobond

16.    Orthobond was founded in 2003, and is based in New Jersey. Orthobond is an antimicrobial technology company that has developed proprietary antimicrobial nanosurfaces, with broad applications in the medical device industry, as well as commercial, industrial, automotive, and other applications.  It is the first company to utilize nanoscale surface modifications that can be permanently bound to any surface, killing bacteria, viruses, and fungi by mechanically rupturing pathogens without using antibiotics.

17.    Orthobond recently announced the release of its patented antimicrobial nano surface technology at the September 2021 American Academy of Orthopaedic Surgeons (AAOS) Annual Meeting in San Diego.  Orthobond's technology will help kill viruses, bacteria, and fungi on contact.[6]  Orthobond's initial products include a series of antimicrobial medical device

---

[6]  *See* https://finance.yahoo.com/news/orthobond-unveils-anti-microbial-surface-130000273.html.

surface treatments designed to provide protection from pathogens without the use of drugs or eluting chemicals, and future product plans include broad applications for textiles, consumer goods and high-touch areas in public places.

18.     Orthobond's confidential and proprietary technology focuses on developments in antimicrobial surface technology, and applications therefor.  This includes methods of preparing a modified-metal surface by attaching a phosphorous-based acid to a surface of a metal through UV-photocatalyzed bonding of compounds containing a photograftable moiety to surface metal oxides, and methods of electrochemically attaching phosphonic acids to metallic substrates, as discussed further below. Orthobond also developed, through the investment of significant time, effort and resources, a confidential and proprietary unique pathway to regulatory approval through the FDA's *de novo* process that was not publicly known for antimicrobial surface technology, and which is significantly valuable for Orthobond's efforts to receive approval for its confidential and proprietary technology.

19.     Orthobond's proprietary technology is the subject of numerous patents and accolades.  Orthobond has invested large sums of time, money and other resources in pursuing its research, including with respect to personnel, facilities and equipment expenses, and the significant amount of time it and its employees devote to advancing technology within its market space.  The significant economic value of Orthobond's proprietary technology is a result of the substantial amounts of time and money that the company has invested and continues to invest in developing its technology.

20.     Orthobond has taken and continues to take steps to protect the confidential and proprietary aspects of its technology.  Orthobond's confidential and proprietary information, know-how and trade secrets (including without limitation its design, development, and testing

8

processes, research processes, quality assurance and compliance processes, and manufacturing processes) are not generally known outside of Orthobond.

21.     Orthobond's protections of its confidential and proprietary information, including its trade secrets, feature without limitation (a) mandatory provisions in its employment agreements barring the unauthorized disclosure or use of such information, including invention and non-disclosure agreements, (b) locks on facility locations where such information is used or stored, (c) password protections on computers and electronically stored information containing any such information, and reasonably controlling access to such information, (d) strict confidentiality provisions in contracts with customers and third parties concerning such information, where implicated, (e) employee policy and training handbooks reiterating the employees' confidentiality obligations, and (f) post-employment communications to former employees, reminding them of their confidentiality obligations under their relevant employment agreements.

22.     Therefore, such confidential and proprietary information constitutes trade secrets, including under NJ Rev Stat § 56:15-2 (2013) and 18 U.S.C. § 1839(3), and is hereinafter referred to as Orthobond's confidential and proprietary information, know-how and trade secrets.

**B.      Marc H. Burel**

23.     Paragraphs 1 through 22 are incorporated by reference as if fully stated herein.

24.     Burel was hired by Orthobond in 2008 for the position of Vice President of Sales and Marketing.  At that time, he executed an Employment Agreement dated December 15, 2008 ("2008 Burel Agreement," attached hereto as Exhibit 5).

25.     The 2008 Burel Agreement includes an Attachment A titled "CONFIDENTIAL INFORMATION AND INVENTION AND NON-DISCLOSURE AGREEMENT" ("2008 Burel NDA").  The 2008 Burel NDA states that the "Employee" (Burel) "agrees that all information,

whether or not in writing, of a private, secret or confidential nature concerning the Company's [Orthobond's] business, business relationships or financial affairs (collectively, 'Proprietary Information') is and shall be the exclusive property of the Company," where such Proprietary Information includes, among other things, inventions, products, processes, methods, techniques, formulas, compositions, compounds, projects, developments, plans, research data and clinical data.  Exhibit 5, Attch. A, Section 1(a).  The 2008 Burel NDA further bars disclosure of Proprietary Information to any person or entity other than Orthobond, or use of the same, without Orthobond's written permission.  *Id.*  The 2008 Burel NDA further states that all Proprietary Information and material containing Proprietary Information shall be the exclusive property of Orthobond.  *Id.*, Section 1(b).

26.     In addition, the 2008 Burel NDA includes a section on "Developments," and states that, *inter alia*, Burel must make "full and prompt written disclosure to the Company" of all developments (including among other things inventions, trade secrets and know-how).  *Id.*, Section 2(a).  This section also states that "[t]he Employee recognizes and agrees that during his/her employment by the Company, the Company solely and exclusively owns all Developments, as well as any and all inherent and appurtenant moral rights and intellectual property rights, including, but not limited to, all patent rights, copyrights, trademarks, know-how and trade secrets (collectively, the 'Intellectual Property Rights'), and the Employee shall treat all Developments as Proprietary Information."  *Id.*, Section 2(b).

27.     Section 6(g) of the 2008 Burel NDA states that the agreement shall be governed by the laws of the State of New Jersey, and that the state and federal courts located in the State of New Jersey have exclusive jurisdiction over all disputes arising under the agreement.

28. Following this, on December 31, 2010, Orthobond and Burel entered into a new employment Agreement, the 2010 Burel Agreement, to establish the terms and conditions of Burel's continued employment with Orthobond, which was executed by Burel and Orthobond's then-acting CEO, Gregory Lutz. Under the 2010 Burel Agreement, Burel's title was changed to Vice President and Chief Operating Officer of Orthobond. Exhibit 1, Section 3. The 2010 Burel Agreement states that it is the entire agreement between Orthobond and Burel with respect to the subject matter contained therein, and supersedes all prior agreements (including the 2008 Burel Agreement). *Id.*, Section 8.2.

29. Like the 2008 Burel Agreement, the 2010 Burel Agreement contains restrictions and obligations with respect to Orthobond's confidential and proprietary information, know-how and trade secrets. Section 6.1 of the 2010 Burel Agreement states:

> During the course of the Executive's employment by the Company (prior to and during the Term) or otherwise, the Executive has had and will have access to certain trade secrets and confidential information relating to the Company and its subsidiaries and other affiliates, its and their respective direct and indirect parent entities and direct and indirect subsidiaries and each of their respective affiliates, as well as their respective predecessors, successors and assigns (collectively, the "Protected Parties") which is not readily available from sources outside the Protected Parties. The confidential and proprietary information and trade secrets of the Protected Parties are among their most valuable assets, including but not limited to, their customer, supplier and vendor lists, databases, competitive strategies, computer programs, frameworks, or models, their marketing programs, their sales, financial, marketing, training and technical information, their product development (and proprietary product data) and any other information, whether communicated orally, electronically, in writing or in other tangible forms concerning how the Protected Parties create, develop, acquire or maintain their products and marketing plans, target their potential customers and operate their retail and other businesses, plus, to the extent made available to the Protected Parties on a confidential basis, similar information regarding the businesses of the customers and suppliers of the Protected Parties. The Protected Parties invested, and continue to invest, considerable amounts of time and

money in their process, technology, know-how, obtaining and developing the goodwill of their customers, their other external relationships, their data systems and data bases, and all the information described above (hereinafter collectively referred to as "Confidential Information"), and any misappropriation or unauthorized disclosure of Confidential Information in any form would irreparably harm the Protected Parties. … The Executive acknowledges that such Confidential Information constitutes valuable, highly confidential, special and unique property of the Protected Parties.

*Id.*, Section 6.1(a).

30.    In view of the value and need to protect this confidential and proprietary information, know-how and trade secrets, the 2010 Burel Agreement states:

The Executive shall hold in a fiduciary capacity for the benefit of the Protected Parties all Confidential Information relating to the Protected Parties and their businesses, which shall have been obtained by the Executive during the Executive's employment by the Company or its subsidiaries or other affiliates or otherwise and which shall not be or become public knowledge; (in the event that Confidential Information becomes public knowledge by acts by the Executive or representatives of the Executive in violation of this Agreement, the foregoing limitation regarding "public knowledge" shall not apply).  The Executive shall not, during the period the Executive is employed by the Company or its subsidiaries or other affiliates or at any time thereafter, disclose any Confidential Information, directly or indirectly, to any person or entity for any reason or purpose whatsoever, nor shall the Executive use it in any way, except (i) in the course of the Executive's employment with, and for the benefit of, the Protected Parties (ii) to enforce any rights or defend any claims hereunder or under any other agreement to which the Executive is a party, provided that such disclosure is relevant to the enforcement of such rights or defense of such claims and is only disclosed to the extent necessary in the formal proceedings related thereto, or (iii) when required to do so by a court of law, by any government agency having supervisory authority over the business of the Company or by any administrative or legislative body (including a committee thereof) with jurisdiction to order him to divulge, disclose or make accessible such information, *provided that* the Executive shall give prompt written notice to the Company of such requirement, disclose no more information than is so required, and cooperate with any attempt by the Company to obtain a protective order or similar treatment.  The Executive shall take all reasonable steps to safeguard the Confidential Information

and to protect against disclosure, misuse, espionage, loss and theft. The Executive understands and agrees that the Executive shall acquire no rights to any such Confidential Information.

*Id.*, Section 6.1(a).

31.     Like the 2008 Burel Agreement, the 2010 Burel Agreement also contains a provision requiring the prompt disclosure by Burel of all developments (including among other things inventions, trade secrets and know-how), which belong to Orthobond. *Id.*, Section 6.1(c). Section 8.5 of the 2010 Burel Agreement also states that the agreement shall be governed by the laws of the State of New Jersey, and that the state and federal courts located in the State of New Jersey have exclusive jurisdiction over all disputes arising under the agreement. Section 8.12 of the 2010 Burel Agreement states that the provisions of the foregoing sections (among others) "shall survive the termination of this Agreement and the employment relationship hereunder." *Id.*, Section 8.12.

32.     On or about June 2013, Burel was appointed to Orthobond's Board of Directors, and elected as Chief Executive Officer (CEO) of Orthobond. The 2010 Burel Agreement remained in effect, and was not altered as a result of this promotion. On or about November 2016, Burel was removed from his position as CEO of Orthobond, and replaced by Charles S. Ryan. Burel subsequently returned to his role as Chief Operating Officer and remained President of Orthobond.

33.     In his role as Vice President of Sales and Marketing, and later as Vice President and Chief Operating Officer and Chief Executive Officer, Burel was made aware of a substantial portion of Orthobond research and development initiatives. Burel attended weekly meetings during which he received reviews and information concerning progress and challenges relating to ongoing research and development efforts, and he was heavily involved in business development

and market opportunity identification for Orthobond's technology, including its non-eluting antimicrobial surface technology.

34.     In or around late June 2017, Orthobond and Burel began negotiating a separation agreement regarding the termination of Burel's employment at Orthobond.  On August 1, 2017, Orthobond and Burel executed a Separation Agreement ("2017 Separation Agreement," attached hereto as Exhibit 6).

35.     The 2017 Separation Agreement states that Burel's last day of employment at Orthobond was to be August 31, 2017.  Exhibit 6 at Section 1(a).  It further states that, except to the extent modified by the 2017 Separation Agreement, Burel's "confidentiality, non solicitation, non-competition, and property obligations set forth within Sections 6.1, 6.2, 6.3, and 6.4 of the Employment Agreement [i.e., the 2010 Burel Agreement] (including all subsections thereof), respectively, remain in full force and effect notwithstanding his execution of this Agreement." *Id.*, Section 4(f).  Section 4 further required the return of all Orthobond property (including Orthobond's computer equipment, trade secrets, and other confidential information in Burel's possession), and the assignment of all rights Burel may have had in any work product that was developed in connection with his employment at Orthobond.  *Id.*, Sections 4(b), 4(c).

36.     At all times, Orthobond has complied with all of its obligations under the 2010 Burel Agreement, and the 2017 Separation Agreement.

37.     After Burel left Orthobond, Orthobond became aware that Burel had joined and/or helped found a new company, MST, which appeared to be registered to his home address, and that appeared to claim that it was in the business of developing antimicrobial surface technology (i.e., the same business conducted by Orthobond). Orthobond also became aware that Burel did

not return computer equipment that was previously provided to Burel by Orthobond due to his employment and role at Orthobond, in violation of the 2017 Separation Agreement.

38.    Orthobond was immediately concerned that the computer improperly in Burel's possession may have contained trade secrets and other confidential information.  When Burel refused to return Orthobond's computer despite Orthobond's demands that he do so, Orthobond filed a lawsuit against Burel in the Superior Court of New Jersey, Chancery Division – Middlesex County, No. C-146-18 ("Prior Lawsuit"), seeking immediate return of its property, trade secrets, and other confidential information in Burel's possession.

39.    Orthobond and Burel thereafter entered into a Settlement Agreement, executed on February 19, 2019, to resolve the dispute over the property that Burel removed from Orthobond without authorization ("2019 Settlement Agreement," attached hereto as Exhibit 7).  The 2019 Settlement Agreement required, among other things, the return of Orthobond's computer, as well as the return of all Orthobond files and other information that may have been in Burel's possession.  Exhibit 7, Section 1(e).  The 2019 Settlement Agreement also contained an Affirmation as to Possession of Confidential Information / Trade Secrets, in which Burel declared, under penalty of perjury, that since his separation from Orthobond, he had not directly or indirectly used, transferred, accessed or made copies of any Orthobond confidential information or trade secrets.  *Id.*, Section 1(f).  In exchange for the promises, acknowledgements and representations by Burel contained within the agreement, Orthobond agreed to release Burel from any and all liabilities for claims that Orthobond asserted or could have been asserted against him in the Prior Lawsuit, "provided such Claims accrued prior to the Effective Date of this Agreement" (i.e., prior to February 19, 2019).  *Id.*, Section 2.

15

40.     Following execution of the 2019 Settlement Agreement, Burel returned

Orthobond's computer equipment.  At the time of the 2019 Settlement Agreement, Orthobond

was not aware of Burel's misappropriation of any of Orthobond's confidential and proprietary

information, know-how or trade secrets.

    **C.**     **Randell "Randy" Clevenger, Ph.D.**

41.     Paragraphs 1 through 40 are incorporated by reference as if fully stated herein.

42.     Clevenger was hired by Orthobond in 2006 for the position of Staff Scientist.  At

that time, he executed the 2006 Clevenger Agreement (Exhibit 2).

43.     The 2006 Clevenger Agreement includes an Attachment A titled

"CONFIDENTIAL INFORMATION AND INVENTION AND NON-DISCLOSURE

AGREEMENT" ("2006 Clevenger NDA").  The 2006 Clevenger NDA states:

> The Employee [Clevenger] agrees that all information, whether or
> not in writing, of a private, secret or confidential nature concerning
> the Company's [Orthobond's] business, business relationships or
> financial affairs (collectively, "Proprietary Information") is and
> shall be the exclusive property of the Company.  By way of
> illustration, but not limitation, Proprietary Information may include
> inventions, products, processes, methods, techniques, formulas,
> compositions, compounds, projects, developments, plans, research
> data, clinical data, financial data, personnel data, computer
> programs, customer and supplier lists, and contacts at or knowledge
> of customers or prospective customers of the Company. The
> Employee will not disclose any Proprietary Information to any
> person or entity other than employees of the Company or use the
> same for any purposes (other than in the performance of his/her
> duties as an employee of the Company) without written approval by
> an officer of the Company, either during or after his/her employment
> with the Company, unless and until such Proprietary Information
> has become public knowledge without fault by the Employee.

Exhibit 2, Attch. A, Section I(A).  The 2006 Clevenger NDA further states that all Proprietary

Information and material containing Proprietary Information shall be the exclusive property of

Orthobond.  *Id.*, Section I(B).  And, the 2006 Clevenger NDA includes a required obligation "not to disclose or to use information and materials" of the aforementioned type.  *Id.*, Section I(C).

44.    In addition, the 2006 Clevenger NDA includes a section on "Developments," and states that, *inter alia*, Clevenger must make "full and prompt disclosure to the Company" of all developments (including inventions, improvements, discoveries, methods, developments, software, and works of authorship).  *Id.*, Section II(A).  This section also states that "[t]he Employee agrees to assign and does hereby assign to the Company (or any person or entity designated by the Company) all his/her right, title and interest in and to all Developments and all related patents, patent applications, copyrights and copyright applications."  *Id.*, Section II(B).

45.    Section VI(F) of the 2006 Clevenger NDA states that the restrictions contained in the NDA "are necessary for the protection of the business and goodwill of the Company and are considered by the Employee to be reasonable for such purpose," and that "any breach of this Agreement is likely to cause the Company substantial and irrevocable damage which is difficult to measure," and therefore an injunction would be warranted.  *Id.*, Section VI(F).  Section VI(G) of the 2006 Clevenger NDA further states that the agreement shall be governed by the laws of the State of New Jersey, and that the state and federal courts located in the State of New Jersey have exclusive jurisdiction over all disputes arising under the agreement.  *Id.*, Section VI(G).

46.    In his role as Staff Scientist, Clevenger worked directly on Orthobond research and development initiatives, including its antimicrobial surface technologies.  In 2011, Clevenger was promoted to Vice President of Research & Development, and in that role he oversaw all Orthobond research and development activities.  Clevenger was actively involved in chemistry experiments relating to antimicrobial surface technologies, and he helped develop the process for creating methacryloyloxydodecylpyridinium bromide ("MDPB") antimicrobial surface treatment

using the atom transfer radical polymerization ("ATRP") chemistry process pioneered by Orthobond. While at Orthobond, Clevenger also took part in, and claims to have taken part in, developing the antimicrobial surface technology, as discussed below.

47.    At all times, Orthobond has complied with all of its obligations under the 2006 Clevenger Agreement.

48.    In or about November 2017, Clevenger's employment at Orthobond was terminated. After his termination, Orthobond became aware that Clevenger joined and/or had helped found MST, a company that appeared to claim that it was in the business of developing antimicrobial surface technology (i.e., the same business conducted by Orthobond).

49.    On June 16, 2020, Orthobond sent a letter (attached hereto as Exhibit 8) to Clevenger noting his employment at MST, and reminding him of his obligations under the 2006 Clevenger Agreement (and NDA). The letter demanded that Clevenger refrain from, or immediately cease and desist, any and all activities that violate the agreement, including the disclosure or use of any Orthobond confidential information. *See id.* Clevenger did not respond to Orthobond's letter.

**D.    Gordon D. Donald, M.D.**

50.    Paragraphs 1 through 49 are incorporated by reference as if fully stated herein.

51.    Donald was hired by Orthobond in 2015 for the position of Co-Chair of Orthobond's Scientific Advisory Board. At that time, he executed the 2014 Donald Agreement (Exhibit 3).

52.    The 2014 Donald Agreement states that "[t]he Advisor [Donald] understands that, in connection with his engagement by Orthobond, he may receive, produce, or otherwise be exposed to Orthobond's trade secrets and other business, proprietary and/or technical

information," including without limitation, research, analysis, ideas, know-how and formulae.

Exhibit 3, Section 4(a).  The 2014 Donald Agreement further states:

> The Advisor acknowledges that the Confidential Information is Orthobond's exclusive and extremely valuable property. Accordingly, the Advisor agrees to segregate all Confidential Information from his own information and from information of other companies and entities and agrees (i) not to reproduce any Confidential Information without Orthobond's prior written consent, (ii) not to use the Confidential Information except in the performance of his obligations pursuant to this Agreement and (iii) not to divulge all or any part of the Confidential Information in any form to any third party, either during or after the term of this Agreement, except as may be required by law, in which case, the Advisor shall promptly notify Orthobond prior to any such disclosure and (at Orthobond's expense) use his reasonable efforts to assist Orthobond in any lawful manner requested by Orthobond should Orthobond seek to contest or minimize such disclosure.

*Id.*, Section 4(b).

53.    The 2014 Donald Agreement further requires an Assignment of Works, and

states:

> The Advisor shall communicate in writing and disclose to Orthobond promptly and fully all ideas, concepts, improvements, inventions and works of authorship (whether or not patentable or copyrightable and whether made solely by the Advisor or jointly with others), that are both: (i) conceived, created or first reduced to practice by the Advisor during the term of this Agreement and (ii) arise or are created substantially from or as a result of the services performed by the Advisor hereunder, or from information derived from Orthobond or its employees, directors, officers, agents, representatives or other advisors, including any other members of the SAB (all of the foregoing, together with all intellectual property rights with respect thereto, collectively and individually are referred to in this Agreement as the "Works"). The Advisor agrees that the Works are and shall remain the sole and exclusive property of Orthobond, whether or not patented or copyrighted and without regard to any termination or expiration of this Agreement. The Advisor further agrees to assign, and hereby irrevocably and unconditionally assigns, to Orthobond all of the Advisor's right, title and interest, including, without limitation, all patent, copyright, mask work, trade secret and trademark rights, in and to the Works in perpetuity.

*Id.*, Section 5.

54.     Section 14 of the 2014 Donald Agreement states that the agreement shall be governed by the laws of the State of New Jersey, and that the state and federal courts located in the State of New Jersey have exclusive jurisdiction over all disputes arising under the agreement. *Id.*, Section 14.

55.     In his role as Co-Chair of Orthobond's Scientific Advisory Board, Donald was regularly given updates on the status of Orthobond's various R&D initiatives including technical and regulatory reviews.  Donald was also involved in the search for additional R&D partnerships with external companies.

56.     At all times, Orthobond has complied with all of its obligations under the 2014 Donald Agreement.

57.     On or about August 3, 2017, Donald submitted a letter of resignation to Charles Ryan, the CEO of Orthobond at the time, stating his intention to tender his resignation from the Board.  Exhibit 9.  In his letter, Donald notes that "Orthobond has been growing and is currently fiscally sound," but that he felt the Scientific Advisory Board "appears to have lost importance to the company and maybe appropriately so."  Upon information and belief, Donald's employment at Orthobond was terminated shortly thereafter.  After his termination, Orthobond became aware that Donald joined and/or had helped found MST, a company that appeared to claim that it was in the business of developing antimicrobial surface technology (i.e., the same business conducted by Orthobond).

58.     On August 17, 2020, Orthobond sent a letter (attached hereto as Exhibit 10) to Donald noting his employment at MST, and reminding him of his obligations under the 2014 Donald Agreement.  The letter demanded that Donald refrain from, or immediately cease and

desist, any and all activities that violate the agreement, including the disclosure or use of any

Orthobond confidential information.  *See id.*  Donald did not respond to Orthobond's letter.

### E.    <u>Cheoljin "CJ" Kim, Ph.D.</u>

59.    Paragraphs 1 through 58 are incorporated by reference as if fully stated herein.

60.    Kim was hired by Orthobond in 2011 for the position of Research Scientist.  At

that time, he executed the 2011 Kim Agreement (Exhibit 4).

61.    The 2011 Kim Agreement includes an Attachment A titled "CONFIDENTIAL

INFORMATION AND INVENTION AND NON-DISCLOSURE AGREEMENT" ("2011 Kim

NDA").  The 2011 Kim NDA states:

> The Employee [Kim] agrees that all information, whether or not in
> writing, of a private, secret or confidential nature concerning the
> Company's [Orthobond's] business, business relationships or
> financial affairs (collectively, "Proprietary Information") is and
> shall be the exclusive property of the Company.  By way of
> illustration, but not limitation, Proprietary Information may include
> inventions, products, processes, methods, techniques, formulas,
> compositions, compounds, projects, developments, plans, research
> data, clinical data, financial data, personnel data, computer
> programs, customer and supplier lists, and contacts at or knowledge
> of customers or prospective customers of the Company. The
> Employee will not disclose any Proprietary Information to any
> person or entity other than employees of the Company or use the
> same for any purposes (other than in the performance of his/her
> duties as an employee of the Company) without written approval by
> an officer of the Company, either during or after his/her employment
> with the Company, unless and until such Proprietary Information
> has become public knowledge without fault by the Employee.

Exhibit 4, Attch. A, Section I(A).  The 2011 Kim NDA further states that all Proprietary

Information and material containing Proprietary Information shall be the exclusive property of

Orthobond.  *Id.*, Section I(B).  And, the 2011 Kim NDA includes a required obligation "not to

disclose or to use information and materials" of the aforementioned type.  *Id.*, Section I(C).

62.    In addition, the 2011 Kim NDA includes a section on "Developments," and states that, *inter alia*, Kim must make "full and prompt disclosure to the Company" of all developments (including inventions, improvements, discoveries, methods, developments, software, and works of authorship).  *Id.*, Section II(A).  This section also states that "[t]he Employee agrees to assign and does hereby assign to the Company (or any person or entity designated by the Company) all his/her right, title and interest in and to all Developments and all related patents, patent applications, copyrights and copyright application."  *Id.*, Section II(B).

63.    Section VI(F) of the 2011 Kim NDA states that the restrictions contained in the NDA "are necessary for the protection of the business and goodwill of the Company and are considered by the Employee to be reasonable for such purpose," and that "any breach of this Agreement is likely to cause the Company substantial and irrevocable damage which is difficult to measure," and therefore an injunction would be warranted.  *Id.*, Section VI(F).  Section VI(G) of the 2011 Kim NDA further states that the agreement shall be governed by the laws of the State of New Jersey, and that the state and federal courts located in the State of New Jersey have exclusive jurisdiction over all disputes arising under the agreement.  *Id.*, Section VI(G).

64.    In his role as Research Scientist, Kim worked on many of Orthobond's research and development initiatives, including Orthobond's confidential and proprietary efforts to develop quaternized chitosan (which later became the subject of one of MST's patent applications, discussed below).  In or around March 2018, Kim presented his research on quaternized chitosan to individuals within Orthobond, including Orthobond's interim CEO and founder, Greg Lutz.  Kim continued working on these efforts following the March 2018 presentation, and discussed these efforts with at least Dr. Jordan Katz (Orthobond's current Chief

Scientific Officer).  These ongoing efforts to develop quaternized chitosan were a major objective to Orthobond, and critical to its future operations.

65.     At all times, Orthobond has complied with all of its obligations under the 2011 Kim Agreement.

66.     In or about August 2018, Kim's employment at Orthobond was terminated.  After his termination, Orthobond became aware that Kim joined and/or had helped found MST, a company that appeared to claim that it was in the business of developing antimicrobial surface technology (i.e., the same business conducted by Orthobond).

67.     On June 16, 2020, Orthobond sent a letter (attached hereto as Exhibit 11) to Kim noting his employment at MST, and reminding him of his obligations under the 2011 Kim Agreement (and NDA).  The letter demanded that Kim refrain from, or immediately cease and desist, any and all activities that violate the agreement, including the disclosure or use of any Orthobond confidential information.  *See id.*  Kim did not respond to Orthobond's letter.

### F.    **Molecular Surface Technologies, LLC**

68.     Paragraphs 1 through 67 are incorporated by reference as if fully stated herein.

69.     Upon information and belief, on or around November 6, 2017, a Certificate of Formation of Molecular Surface Technologies, LLC was filed with the Delaware Secretary of State office.  Upon information and belief, on or around June 23, 2020, Burel filed a Certificate of Revival of a Delaware Limited Liability Company on behalf of MST.

70.     Upon information and belief, and according to MST's website, MST was founded by Donald, Burel and Clevenger in or around November 2017, shortly after Donald, Burel and Clevenger left Orthobond.  Upon information and belief, Kim joined MST shortly after he left Orthobond in August 2018.

71.     MST directly competes with Orthobond in the same market and technology space. Upon information and belief, MST purports to be an antimicrobial technology company that has allegedly developed a technology for modifying the molecular surface of materials through covalent bonding processes.[7]  In his role as CEO of MST, Burel has stated that "MST has developed several proprietary treatment processes that work with most medical grade metals and polymers."  Exhibit 12.[8] In his role as Chief Scientific Officer of MST, Clevenger has stated that "We are excited to have developed a modified molecule that responds very favorably when covalently attached and has shown greater than 4-5 logs of killing with almost all applicable bacteria while remaining very cell friendly."  *Id.*

### G.     Discovery of the Defendants' Actions Underlying the Claims

72.     Paragraphs 1 through 71 are incorporated by reference as if fully stated herein.

73.     In or about June 2020, Orthobond became aware that MST and its employees (which, upon information and belief, includes one or more of the Defendants) were making representations in the marketplace to the effect that they were the proprietary and beneficial owner of certain electrochemical and photocatalytic coating process technologies (that were developed, in whole or in substantial part, at Orthobond), and that they were planning on bringing these technologies to market.[9]  Around this time, Orthobond also became aware of two U.S. patent application publications—(1) U.S. Patent App. Pub. No. 2020/0109483, corresponding to U.S. Patent App. No. 16/383,263 ("'263 App," filed April 12, 2019 and published April 9, 2020, attached hereto as Exhibit 13); and (2) U.S. Patent App. Pub. No.

---

[7] *See* https://mosutech.com/front-page/technology/.

[8] *Available at* https://ryortho.com/breaking/new-company-launched-to-tackle-periprosthetic-infections-and-more/.

[9] *See, e.g.*, https://mosutech.com/front-page/for-investors/.

2020/0206776, corresponding to U.S. Patent App. No. 16/727,439 ("'439 App," filed Dec. 26, 2019 and published July 2, 2020, attached hereto as Exhibit 14)—that identified Clevenger and Donald as named inventors, and that further identified MST as the Applicant and assignee. The '263 App includes a priority claim to Provisional App. No. 62/657,274, filed April 13, 2018, and later issued on December 29, 2020 as U.S. Patent No. 10,876,217. The '439 App includes a priority claim to Provisional App. No. 62/785,162, filed Dec. 26, 2018. Prior to their publication, the '263 App and '439 App were not publicly available, to Orthobond or to any other third party.

74.     The technology disclosed and claimed in the '263 App and '439 App was developed, in whole or in substantial part, at Orthobond by Dr. Jordan Katz in or about February 2017, and comprised Orthobond confidential and proprietary information, know-how and trade secrets to which Defendants had direct access and knowledge during their employment at Orthobond. In particular, the '263 App disclosed, published and claimed Orthobond's confidential and proprietary method of preparing a modified-metal surface by attaching a phosphorous-based acid to a surface of a metal, including articles made according to the disclosed method. The '439 App disclosed, published and claimed Orthobond's confidential and proprietary method of UV-photocatalyzed bonding of compounds containing a photograftable moiety to surface metal oxides, including articles having such compounds covalently bound to metal oxides present on surfaces thereof. Upon information and belief, Defendants, individually and/or in concert, improperly accessed, transferred and/or used Orthobond's confidential and proprietary information, know-how and trade secrets to develop technology for MST in order to secure funding for its business, and directly compete with Orthobond's technology.

75.    On August 13, 2020, counsel for Orthobond sent a letter to Burel (attached hereto as Exhibit 15), on which Clevenger and Donald were copied, informing him that these acts constitute trade secret misappropriation, violate New Jersey's unfair competition laws, tortiously interfere with Orthobond's contractual relations and business opportunities, and breach the nondisclosure agreements of the former Orthobond employees involved, among other things, and further constitute a breach of the 2019 Settlement Agreement.  Orthobond's letter demanded that Burel cease and desist any actual or planned commercialization of the subject matter embodied in the MST Patent Applications, inform all parties to which MST may have represented that it is entitled to practice these technologies that these technologies are proprietary to Orthobond and not MST, and transfer ownership of and power of attorney in the MST Patent Applications and all related counterparts to Orthobond.  *See id.*  Upon information and belief, Burel, Clevenger and Donald refused to do any of these demanded actions.

76.    In order to protect Orthobond's rights to the confidential and proprietary information, know-how and trade secrets improperly disclosed, embodied and claimed in the MST Patent Applications, on April 21, 2021, Orthobond filed a Petition to Institute Derivation Proceeding Pursuant to 35 U.S.C. § 135, requesting that the U.S. Patent & Trademark Office ("USPTO") find that the subject matter of the '439 App was improperly derived from the inventions conceived by Dr. Katz and assigned to Orthobond, and refuse MST's claims attempting to cover that subject matter in the '439 App.  *See* Petition, Case No. DER2021-00008, attached hereto as Exhibit 16 and incorporated herein by reference.

77.    In or about March 2021, Orthobond also became aware of yet another U.S. patent application publication—U.S. Patent App. Pub. No. 2020/0404905, corresponding to U.S. Patent App. No. 16/906,573 ("'573 App," filed June 19, 2020 and published December 31, 2020,

attached hereto as Exhibit 17)—that identified Clevenger, Donald and Kim as named inventors, and that further identified MST as the Applicant and assignee. Once again, the technology disclosed and claimed in the '573 App was developed, in whole or in substantial part, at Orthobond, and comprised Orthobond confidential and proprietary information, know-how and trade secrets to which Defendants had direct access and knowledge during their employment at Orthobond. The '573 App disclosed, published and claimed Orthobond's confidential and proprietary method of electrochemically attaching phosphonic acids to metallic substrates, including articles made according to the disclosed method. Upon information and belief, Defendants, individually and/or in concert, improperly accessed, transferred and/or used Orthobond's confidential and proprietary information, know-how and trade secrets to develop technology for MST in order to secure funding for its business, and directly compete with Orthobond's technology.

78. In order to protect Orthobond's rights to the confidential and proprietary information, know-how and trade secrets improperly disclosed, embodied and claimed in the '573 App, on June 30, 2021, Orthobond filed a Third Party Preissuance Submission (attached hereto as Exhibit 18), requesting that the USPTO review patents and patent publications of relevance to the examination of the '573 App, including U.S. Patent App. Pub. No. 2018/0103643, which corresponds to U.S. Application no. 15/785,789 ("'789 App," Exhibit 19). The '789 App includes a priority claim to Provisional App. No. 62/408,913, filed October 17, 2016. The '789 App identifies Clevenger as the sole inventor, and Orthobond as the Applicant and assignee. The Orthobond confidential and proprietary information, know-how and trade secrets improperly disclosed, embodied and claimed in the '573 App directly relates to similar

subject matter previously developed at Orthobond, and, upon information and belief, known to Defendants during and as a result of their employment at Orthobond.

79.    In or about July 2021, Orthobond also became aware of yet another U.S. patent application publication—U.S. Patent App. Pub. No. 2021/0207282, corresponding to U.S. Patent App. No. 17/135,494 ("'494 App," filed December 28, 2020 and published July 8, 2021, attached hereto as Exhibit 20)—that identified Clevenger and Donald as named inventors, and that further identified MST as the Applicant and assignee.  The '494 App was filed as a division application of the '263 App.  Once again, the technology disclosed and claimed in the '494 App was developed, in whole or in substantial part, at Orthobond, and comprised Orthobond confidential and proprietary information, know-how and trade secrets to which Defendants had direct access and knowledge during their employment at Orthobond. The '494 App disclosed, published and claimed Orthobond's confidential and proprietary method of electrochemically attaching phosphonic acids to metallic substrates, including articles made according to the disclosed method.  Upon information and belief, Defendants, individually and/or in concert, improperly accessed, transferred and/or used Orthobond's confidential and proprietary information, know-how and trade secrets to develop technology for MST in order to secure funding for its business, and directly compete with Orthobond's technology.

80.    In order to protect Orthobond's rights to the confidential and proprietary information, know-how and trade secrets improperly disclosed, embodied and claimed in the '494 App, on December 16, 2021, Orthobond filed a Third Party Preissuance Submission (attached hereto as Exhibit 21), requesting that the USPTO review patents and patent publications of relevance to the examination of the '494 App, including the '789 App.  The Orthobond confidential and proprietary information, know-how and trade secrets improperly

disclosed, embodied and claimed in the '494 App directly relates to similar subject matter previously developed at Orthobond, and, upon information and belief, known to Defendants during and as a result of their employment at Orthobond.

81.    On information and belief, in addition to the Orthobond confidential and proprietary information, know-how and trade secrets improperly disclosed, embodied and claimed in the '263 App, '439 App, '573 App and '494 App, Burel, Clevenger, Donald and/or Kim, alone and/or in concert, have misappropriated additional Orthobond confidential and proprietary information, know-how and trade secrets that have yet to become known by Orthobond, and that are currently being improperly disclosed, accessed, and/or used by MST and its employees (including the Defendants) without Orthobond's authorization or consent.

82.    In addition, in or about April 2021, Orthobond became aware that Defendants, including MST, were utilizing, and/or representing that they were utilizing, Orthobond's confidential and proprietary unique pathway to regulatory approval through the FDA's *de novo* process that was not publicly known for antimicrobial surface technology, in order to gain approval for their actual or forthcoming products that are intended to compete with Orthobond's technology.  *See* Exhibit 22 at 18 ("They are confident that their technology will be cleared by way of a 510(k) or de novo and they will be able to get a partner to the FDA in 12-16 months.").[10]  Defendants' reliance on and/or use of Orthobond's confidential and proprietary unique pathway to regulatory approval to gain expedited approval of their products intended to compete directly with Orthobond's technology, and public disclosure of the same, has resulted and will continue to result in direct harm to Orthobond.

---

[10] *Available at* https://ryortho.com/2021/03/next-generation-spine-companies-and-2021-outlook/.

83.     The actions by the Defendants described above constitute a material breach of their employment agreements, including the confidentiality provisions contained therein.

84.     The actions by the Defendants directly and irreparably harmed Orthobond, at least because Defendants improperly disclosed and used Orthobond's confidential and proprietary information, know-how and trade secrets to secure funding and investments that, upon information and belief, would have otherwise been secured, in whole or in part, by Orthobond, and caused (and continue to cause) Orthobond to lose at least a portion of its business. Upon information and belief, Defendants, including MST, have used and are using Orthobond's confidential and proprietary information, know-how and trade secrets to develop technology that will, do and/or are intended to compete directly with Orthobond's technology in the same or similar marketplace.

85.     The actions by the Defendants further harmed Orthobond because they have caused and continue to cause an erosion of Orthobond's reputation and the trust and confidence of the competitive marketplace, including as a result of Defendants false representations in the marketplace regarding the relative value of MST's purported technology that had been improperly developed using Orthobond's confidential and proprietary information, know-how and trade secrets.

86.     Furthermore, because Orthobond's confidential and proprietary information, know-how and trade secrets embodied in the MST Patent Applications was published by MST, at the direction of and/or through knowledge and participation by the individual Defendants, Orthobond's confidential and proprietary information, know-how and trade secrets became publicly available, thereby directly and irreparably harming Orthobond and improperly and unfairly benefiting Defendants and MST, including by unfairly and improperly giving them a

head start in competing technology (as well as other possible competitors to Orthobond) without the necessary expenditures of time, money and resources. Upon information and belief, as a result of this head start, Defendants have represented to the marketplace that MST's technology is the same as or better than Orthobond's technology, and/or a cheaper alternative to Orthobond's technology, which has further harmed Orthobond.

87.     In addition, the actions by Defendants have forced Orthobond to take actions to protect its rights to the confidential and proprietary information, know-how and trade secrets improperly disclosed, including the filing of the Petition to Institute Derivation Proceeding and Third Party Preissuance Submissions, which involve significant expenditures of time, effort and money that has resulted in additional harm to Orthobond.

## CLAIMS FOR RELIEF

## COUNT I

### MISAPPROPRIATION OF TRADE SECRETS
**Defend Trade Secrets Act – 18 U.S.C. § 1832, *et seq.***
**(All Defendants)**

88.     Paragraphs 1 through 87 are incorporated by reference as if fully stated herein.

89.     Burel possesses and has possessed trade secret information belonging to Orthobond including, but not limited to, its confidential and proprietary information, know-how and trade secrets described above, by virtue of Burel's employment with Orthobond, and significant involvement in matters involving Orthobond's confidential and proprietary information, know-how and trade secrets.

90.     Clevenger possesses and has possessed trade secret information belonging to Orthobond including, but not limited to, its confidential and proprietary information, know-how and trade secrets described above, by virtue of Clevenger's employment with Orthobond, and

significant involvement in matters involving Orthobond's confidential and proprietary information, know-how and trade secrets.

91.    Donald possesses and has possessed trade secret information belonging to Orthobond including, but not limited to, its confidential and proprietary information, know-how and trade secrets described above, by virtue of Donald's employment with Orthobond, and significant involvement in matters involving Orthobond's confidential and proprietary information, know-how and trade secrets.

92.    Kim possesses and has possessed trade secret information belonging to Orthobond including, but not limited to, its confidential and proprietary information, know-how and trade secrets described above, by virtue of Kim's employment with Orthobond, and significant involvement in matters involving Orthobond's confidential and proprietary information, know-how and trade secrets.

93.    MST possesses and has possessed trade secret information belonging to Orthobond including, but not limited to, its confidential and proprietary information, know-how and trade secrets described above, by virtue of Burel, Donald, Clevenger and Kim's employment with MST, their prior employment with Orthobond, and their disclosure and/or use of Orthobond's confidential and proprietary information, know-how and trade secrets in carrying out MST's business on its behalf, and/or as officers and employees of MST.

94.    Orthobond's confidential and proprietary information, know-how and trade secrets are directly related to the design, development, testing and manufacturing of products that are intended for use in or sale by Orthobond, through interstate or foreign commerce.

95.    Orthobond's confidential and proprietary information, know-how and trade secrets are not generally known and Orthobond takes reasonable steps to maintain confidentiality with respect to its trade secret material, including the information discussed above.

96.    Orthobond derives independent economic value from its confidential and proprietary information, know-how and trade secrets as described above, including because they are not generally known to or readily ascertainable through proper means by another person who can obtain economic value from the disclosure or use of the information

97.    In his role at MST, Burel has used and disclosed and is continuing to use and disclose Orthobond's confidential and proprietary information, know-how and trade secrets, including trade secret information relating to Orthobond's confidential and proprietary antimicrobial surface technology, and/or Orthobond's confidential and proprietary unique pathway to regulatory approval, without Orthobond's consent or authorization and in breach of his contractual obligations to Orthobond.

98.    In his role at MST, Clevenger has used and disclosed and is continuing to use and disclose Orthobond's confidential and proprietary information, know-how and trade secrets, including trade secret information relating to Orthobond's confidential and proprietary antimicrobial surface technology, and/or Orthobond's confidential and proprietary unique pathway to regulatory approval, without Orthobond's consent or authorization and in breach of his contractual obligations to Orthobond.

99.    In his role at MST, Donald has used and disclosed and is continuing to use and disclose Orthobond's confidential and proprietary information, know-how and trade secrets, including trade secret information relating to Orthobond's confidential and proprietary antimicrobial surface technology, and/or Orthobond's confidential and proprietary unique

pathway to regulatory approval, without Orthobond's consent or authorization and in breach of his contractual obligations to Orthobond.

100.    In his role at MST, Kim has used and disclosed and is continuing to use and disclose Orthobond's confidential and proprietary information, know-how and trade secrets, including trade secret information relating to Orthobond's confidential and proprietary antimicrobial surface technology, and/or Orthobond's confidential and proprietary unique pathway to regulatory approval, without Orthobond's consent or authorization and in breach of his contractual obligations to Orthobond.

101.    MST has used and disclosed and is continuing to use and disclose Orthobond's confidential and proprietary information, know-how and trade secrets, including trade secret information relating to Orthobond's confidential and proprietary antimicrobial surface technology, and/or Orthobond's confidential and proprietary unique pathway to regulatory approval, without Orthobond's consent or authorization.

102.    Defendants' continued disclosure and use of Orthobond's trade secret information constitutes imminent, immediate, and irreparable harm to Orthobond.

103.    Defendants have misappropriated Orthobond's trade secret information and, unless restrained from doing so, will continue to misappropriate Orthobond's trade secret information.

104.    Defendants' misappropriation has been and continues to be willful and malicious, entitling Orthobond to recover attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D) and punitive or exemplary damages pursuant to 18 U.S.C. § 1836(b)(3)(C).

## COUNT II

### MISAPPROPRIATION OF TRADE SECRETS
### New Jersey Trade Secrets Act – N.J. Stat. Ann. §§ 56:15-1 *et seq.*
### (All Defendants)

105.    Paragraphs 1 through 104 are incorporated by reference as if fully stated herein.

106.    Burel possesses and has possessed trade secret information belonging to Orthobond including, but not limited to, its confidential and proprietary information, know-how and trade secrets described above, by virtue of Burel's employment with Orthobond, and significant involvement in matters involving Orthobond's confidential and proprietary information, know-how and trade secrets.

107.    Clevenger possesses and has possessed trade secret information belonging to Orthobond including, but not limited to, its confidential and proprietary information, know-how and trade secrets described above, by virtue of Clevenger's employment with Orthobond, and significant involvement in matters involving Orthobond's confidential and proprietary information, know-how and trade secrets.

108.    Donald possesses and has possessed trade secret information belonging to Orthobond including, but not limited to, its confidential and proprietary information, know-how and trade secrets described above, by virtue of Donald's employment with Orthobond, and significant involvement in matters involving Orthobond's confidential and proprietary information, know-how and trade secrets.

109.    Kim possesses and has possessed trade secret information belonging to Orthobond including, but not limited to, its confidential and proprietary information, know-how and trade secrets described above, by virtue of Kim's employment with Orthobond, and significant involvement in matters involving Orthobond's confidential and proprietary information, know-how and trade secrets.

35

110.    MST possesses and has possessed trade secret information belonging to Orthobond including, but not limited to, its confidential and proprietary information, know-how and trade secrets described above, by virtue of Burel, Donald, Clevenger and Kim's employment with MST, their prior employment with Orthobond, and their disclosure and/or use of Orthobond's confidential and proprietary information, know-how and trade secrets in carrying out MST's business on its behalf and/or at its direction, and/or as officers and employees of MST.

111.    Orthobond's confidential and proprietary information, know-how and trade secrets are directly related to the design, development, testing and manufacturing of products that are intended for use in or sale by Orthobond, through interstate or foreign commerce.

112.    Orthobond's confidential and proprietary information, know-how and trade secrets are not generally known and Orthobond takes reasonable steps to maintain confidentiality with respect to its trade secret material, including the information discussed above.

113.    Orthobond derives independent economic value from its confidential and proprietary information, know-how and trade secrets as described above, including because they are not generally known to or readily ascertainable through proper means by another person who can obtain economic value from the disclosure or use of the information

114.    In his role at MST, Burel has used and disclosed and is continuing to use and disclose Orthobond's confidential and proprietary information, know-how and trade secrets, including trade secret information relating to Orthobond's confidential and proprietary antimicrobial surface technology, and/or Orthobond's confidential and proprietary unique pathway to regulatory approval, without Orthobond's consent or authorization and in breach of his contractual obligations to Orthobond.

36

115.    In his role at MST, Clevenger has used and disclosed and is continuing to use and disclose Orthobond's confidential and proprietary information, know-how and trade secrets, including trade secret information relating to Orthobond's confidential and proprietary antimicrobial surface technology, and/or Orthobond's confidential and proprietary unique pathway to regulatory approval, without Orthobond's consent or authorization and in breach of his contractual obligations to Orthobond.

116.    In his role at MST, Donald has used and disclosed and is continuing to use and disclose Orthobond's confidential and proprietary information, know-how and trade secrets, including trade secret information relating to Orthobond's confidential and proprietary antimicrobial surface technology, and/or Orthobond's confidential and proprietary unique pathway to regulatory approval, without Orthobond's consent or authorization and in breach of his contractual obligations to Orthobond.

117.    In his role at MST, Kim has used and disclosed and is continuing to use and disclose Orthobond's confidential and proprietary information, know-how and trade secrets, including trade secret information relating to Orthobond's confidential and proprietary antimicrobial surface technology, and/or Orthobond's confidential and proprietary unique pathway to regulatory approval, without Orthobond's consent or authorization and in breach of his contractual obligations to Orthobond.

118.    MST has used and disclosed and is continuing to use and disclose Orthobond's confidential and proprietary information, know-how and trade secrets, including trade secret information relating to Orthobond's confidential and proprietary antimicrobial surface technology, and/or Orthobond's confidential and proprietary unique pathway to regulatory approval, without Orthobond's consent or authorization.

119.    Defendants' continued disclosure and use of Orthobond's trade secret information constitutes imminent, immediate, and irreparable harm to Orthobond.

120.    Defendants have misappropriated Orthobond's trade secret information and, unless restrained from doing so, will continue to misappropriate Orthobond's trade secret information.

121.    Defendants' misappropriation has been and continues to be willful and malicious, entitling Orthobond to recover attorneys' fees pursuant to NJ Rev Stat § 56:15-6 and punitive or exemplary damages pursuant to NJ Rev Stat § 56:15-4(b).

**COUNT III**

**UNFAIR COMPETITION**
**(All Defendants)**

122.    Paragraphs 1 through 121 are incorporated by reference as if fully stated herein.

123.    Burel possesses and has possessed confidential information, know-how and trade secret information belonging to Orthobond including, but not limited to, its confidential and proprietary information, know-how and trade secrets described above, by virtue of Burel's employment with Orthobond, and significant involvement in matters involving Orthobond's confidential and proprietary information, know-how and trade secrets.

124.    Clevenger possesses and has possessed confidential information, know-how and trade secret information belonging to Orthobond including, but not limited to, its confidential and proprietary information, know-how and trade secrets described above, by virtue of Clevenger's employment with Orthobond, and significant involvement in matters involving Orthobond's confidential and proprietary information, know-how and trade secrets.

125.    Donald possesses and has possessed confidential information, know-how and trade secret information belonging to Orthobond including, but not limited to, its confidential

38

and proprietary information, know-how and trade secrets described above, by virtue of Donald's employment with Orthobond, and significant involvement in matters involving Orthobond's confidential and proprietary information, know-how and trade secrets.

126.    Kim possesses and has possessed confidential information, know-how and trade secret information belonging to Orthobond including, but not limited to, its confidential and proprietary information, know-how and trade secrets described above, by virtue of Kim's employment with Orthobond, and significant involvement in matters involving Orthobond's confidential and proprietary information, know-how and trade secrets.

127.    MST possesses and has possessed confidential information, know-how and trade secret information belonging to Orthobond including, but not limited to, its confidential and proprietary information, know-how and trade secrets described above , by virtue of its founders (Burel, Donald, and Clevenger) and Kim's employment with MST, their prior employment with Orthobond, and their disclosure and/or use of Orthobond's confidential and proprietary information, know-how and trade secrets in carrying out MST's business on its behalf and/or at its direction, and/or as officers and employees of MST.

128.    Orthobond's confidential and proprietary information, know-how and trade secret information are directly related to the design, development, testing and manufacturing of products that are intended for use in or sale by Orthobond, through interstate or foreign commerce.  Orthobond develops, implements and uses its confidential information, know-how and trade secrets to compete for investment and business in its market, and MST competes for investment and business in the same market.

129.    Orthobond's confidential information, know-how and trade secret information are not generally known and Orthobond takes reasonable steps to maintain confidentiality with

39

respect to its confidential and proprietary information, know-how and trade secrets, including the information discussed above.

130.    Orthobond derives independent economic value from its confidential and proprietary information, know-how and trade secret information, including because it is not generally known to or readily ascertainable through proper means by another person who can obtain economic value from the disclosure or use of the information.

131.    In his role at MST, Burel has used and disclosed and is continuing to use and disclose Orthobond's confidential and proprietary information, know-how and trade secrets, including Orthobond's confidential and proprietary antimicrobial surface technology, and/or Orthobond's confidential and proprietary unique pathway to regulatory approval, without Orthobond's consent or authorization and in breach of his contractual obligations to Orthobond.

132.    In his role at MST, Clevenger has used and disclosed and is continuing to use and disclose Orthobond's confidential and proprietary information, know-how and trade secrets, including Orthobond's confidential and proprietary antimicrobial surface technology, and/or Orthobond's confidential and proprietary unique pathway to regulatory approval, without Orthobond's consent or authorization and in breach of his contractual obligations to Orthobond.

133.    In his role at MST, Donald has used and disclosed and is continuing to use and disclose Orthobond's confidential and proprietary information, know-how and trade secrets, including Orthobond's confidential and proprietary antimicrobial surface technology, and/or Orthobond's confidential and proprietary unique pathway to regulatory approval, without Orthobond's consent or authorization and in breach of his contractual obligations to Orthobond.

134.    In his role at MST, Kim has used and disclosed and is continuing to use and disclose Orthobond's confidential and proprietary information, know-how and trade secrets,

including Orthobond's confidential and proprietary antimicrobial surface technology, and/or Orthobond's confidential and proprietary unique pathway to regulatory approval, without Orthobond's consent or authorization and in breach of his contractual obligations to Orthobond.

135.    MST has used and disclosed and is continuing to use and disclose Orthobond's confidential and proprietary information, know-how and trade secrets, including Orthobond's confidential and proprietary antimicrobial surface technology, and/or Orthobond's confidential and proprietary unique pathway to regulatory approval, without Orthobond's consent or authorization.

136.    Upon information and belief, Defendants made statements in the marketplace mischaracterizing Orthobond's confidential and proprietary technology as Defendants' technology (including MST's technology) in order to obtain an unfair competitive advantage in the marketplace.  Upon information and belief, Defendants sought to encourage removal of, and did encourage removal of, key employees from Orthobond to work at MST (including at least Kim) in order to obtain an unfair competitive advantage in the marketplace.

137.    Defendants' past and continued disclosure and use of Orthobond's confidential and proprietary information, know-how and trade secrets has caused direct and immediate harm to Orthobond, and constitutes imminent, immediate, and irreparable harm to Orthobond. Defendants' past and continued mischaracterizing statements in the marketplace concerning Orthobond's confidential and proprietary technology have caused direct and immediate harm to Orthobond, including by eroding Orthobond's reputation in the marketplace, and constitutes imminent, immediate, and irreparable harm to Orthobond.  Defendants' encouragement of departures from Orthobond have also caused direct and immediate harm to Orthobond, and constitutes imminent, immediate, and irreparable harm to Orthobond

138.    Defendants have misappropriated Orthobond's confidential and proprietary information, know-how and trade secrets, and, unless restrained from doing so, will continue to misappropriate Orthobond's confidential and proprietary information, know-how and trade secrets.

139.    Defendants' misappropriation and other acts of unfair competition described above have been and continue to be willful and malicious, entitling Orthobond to recover attorneys' fees pursuant to NJ Rev Stat § 56:15-6 and punitive or exemplary damages pursuant to NJ Rev Stat § 56:15-4(b).

## COUNT IV

### BREACH OF CONTRACT
### (Individual Defendants)

140.    Paragraphs 1 through 139 are incorporated by reference as if fully stated herein.

141.    Burel and Orthobond entered in to the 2010 Burel Agreement, 2017 Separation Agreement and 2019 Settlement Agreement (collectively, "Burel Agreements"), which are valid and enforceable agreements.

142.    Under the terms of the Burel Agreements, Burel had, and continues to have, an obligation to refrain from disclosing Orthobond's confidential and proprietary information, know-how and trade secrets, and to refrain from using the same for the benefits of any other person or entity without the permission of Orthobond. *See supra* at Background, Section B. This obligation remained even after the termination of Burel's employment relationship with Orthobond. *See id.* Furthermore, the 2019 Settlement Agreement contained an Affirmation as to Possession of Confidential Information / Trade Secrets, in which Burel declared, under penalty of perjury, that since his separation from Orthobond, he had not directly or indirectly used,

transferred, accessed or made copies of any Orthobond confidential information or trade secrets. *See id.*

143.    As described above, Burel breached the Burel Agreements by disclosing, using, and misappropriating Orthobond's confidential and proprietary information, know-how and trade secrets, in conjunction with MST, to develop products competitive with those developed by, and in development by, Orthobond. By engaging in such wrongful conduct, Burel has used and disclosed and continues to use and disclose Orthobond's confidential and proprietary information, know-how and trade secrets in violation of the Burel Agreements.

144.    The Burel Agreements, including the confidentiality and non-disclosure provisions contained therein, are reasonable and serve to protect Orthobond's confidential and proprietary information, know-how and trade secrets, customer relationships, goodwill, and investments. Enforcement of the Burel Agreements will not injure the public in any respect.

145.    Unless restrained by the Court, Burel will continue his unlawful acts.

146.    As a direct and proximate result of Burel's breaches, Orthobond sustained damages, including as described above.

147.    Clevenger and Orthobond entered in to the 2006 Clevenger Agreement and 2006 Clevenger NDA, which are valid and enforceable agreements.

148.    Under the terms of the 2006 Clevenger Agreement and 2006 Clevenger NDA, Clevenger had, and continues to have, an obligation to refrain from disclosing Orthobond's confidential and proprietary information, know-how and trade secrets, and to refrain from using the same for the benefits of any other person or entity without the permission of Orthobond. *See supra* at Background, Section C. This obligation remained even after the termination of Clevenger's employment relationship with Orthobond.  *See id.*  The 2006 Clevenger Agreement

and 2006 Clevenger NDA also require that Clevenger promptly disclose and assign all developments to Orthobond that were created, made, conceived, or reduced to practice by him or under his direction during his employment with Orthobond, and that relate to the business or contemplated business of Orthobond. *See id.*

149.    As described above, Clevenger breached the 2006 Clevenger Agreement and 2006 Clevenger NDA by disclosing, using, and misappropriating Orthobond's confidential and proprietary information, know-how and trade secrets to develop products competitive with those developed by, and in development by, Orthobond. By engaging in such wrongful conduct, Clevenger has used and disclosed and continues to use and disclose Orthobond's confidential and proprietary information, know-how and trade secrets in violation of the 2006 Clevenger Agreement and 2006 Clevenger NDA. Clevenger further breached the 2006 Clevenger Agreement and 2006 Clevenger NDA by failing to promptly assign to Orthobond the purported developments disclosed and claimed in the '263 App, '439 App,'573 App, and '494 App, that were developed, in whole or in substantial part, at Orthobond, and comprise Orthobond's confidential and proprietary information, know-how and trade secrets, as described above.

150.    The 2006 Clevenger Agreement and 2006 Clevenger NDA, including the confidentiality and non-disclosure provisions contained therein, are reasonable and serve to protect Orthobond's confidential and proprietary information, know-how and trade secrets, customer relationships, goodwill, and investments. Enforcement of the 2006 Clevenger Agreement and 2006 Clevenger NDA will not injure the public in any respect.

151.    Unless restrained by the Court, Clevenger will continue his unlawful acts.

152.    As a direct and proximate result of Clevenger's breaches, Orthobond sustained damages, including as described above.

44

153. Donald and Orthobond entered in to the 2014 Donald Agreement, which is a valid and enforceable agreement.

154. Under the terms of the 2014 Donald Agreement, Donald had, and continues to have, an obligation to refrain from disclosing Orthobond's confidential and proprietary information, know-how and trade secrets, and to refrain from using the same for the benefits of any other person or entity without the permission of Orthobond. *See supra* at Background, Section D. This obligation remained even after the termination of Donald's employment relationship with Orthobond. *See id.* The 2014 Donald Agreement also requires that Donald promptly disclose and assign all developments to Orthobond that were conceived, created, or first reduced to practice by him during his employment with Orthobond, and that arise or are created substantially from or as a result of the services provided to Orthobond by Donald, or derived from information from Orthobond or its employees. *See id.*

155. As described above, Donald breached the 2014 Donald Agreement by disclosing, using, and misappropriating Orthobond's confidential and proprietary information, know-how and trade secrets in conjunction with MST, to develop products competitive with those developed by, and in development by, Orthobond. By engaging in such wrongful conduct, Donald has used and disclosed and continues to use and disclose Orthobond's confidential and proprietary information, know-how and trade secrets in violation of the 2014 Donald Agreement. Donald further breached the 2014 Donald Agreement by failing to promptly assign to Orthobond the purported developments disclosed and claimed in the '263 App, '439 App,'573 App, and '494 App, that were developed, in whole or in substantial part, at Orthobond, and comprise Orthobond's confidential and proprietary information, know-how and trade secrets, as described above.

156.    The 2014 Donald Agreement, including the confidentiality and non-disclosure provisions contained therein, are reasonable and serve to protect Orthobond's confidential and proprietary information, know-how and trade secrets, customer relationships, goodwill, and investments. Enforcement of the 2014 Donald Agreement will not injure the public in any respect.

157.    Unless restrained by the Court, Donald will continue his unlawful acts.

158.    As a direct and proximate result of Donald's breaches, Orthobond sustained damages, including as described above.

159.    Kim and Orthobond entered in to the 2011 Kim Agreement and 2011 Kim NDA, which are valid and enforceable agreements.

160.    Under the terms of the 2011 Kim Agreement and 2011 Kim NDA, Kim had, and continues to have, an obligation to refrain from disclosing Orthobond's confidential and proprietary information, know-how and trade secrets, and to refrain from using the same for the benefits of any other person or entity without the permission of Orthobond. *See supra* at Background, Section C. This obligation remained even after the termination of Kim's employment relationship with Orthobond.  *See id.*  The 2011 Kim Agreement and 2011 Kim NDA also require that Kim promptly disclose and assign all developments to Orthobond that were created, made, conceived, or reduced to practice by him or under his direction during his employment with Orthobond, and that relate to the business or contemplated business of Orthobond.  *See id.*

161.    As described above, Kim breached the 2011 Kim Agreement and 2011 Kim NDA by disclosing, using, and misappropriating Orthobond's confidential and proprietary information, know-how and trade secrets in conjunction with MST, to develop products competitive with

46

those developed by, and in development by, Orthobond. By engaging in such wrongful conduct, Kim has used and disclosed and continues to use and disclose Orthobond's confidential and proprietary information, know-how and trade secrets in violation of the 2011 Kim Agreement and 2011 Kim NDA.  Kim further breached the 2011 Kim Agreement by failing to promptly assign to Orthobond the purported developments disclosed and claimed in the '573 App, that were developed, in whole or in substantial part, at Orthobond, and comprise Orthobond's confidential and proprietary information, know-how and trade secrets, as described above.

162.    The 2011 Kim Agreement and 2011 Kim NDA, including the confidentiality and non-disclosure provisions contained therein, are reasonable and serve to protect Orthobond's confidential and proprietary information, know-how and trade secrets, customer relationships, goodwill, and investments. Enforcement of the 2011 Kim Agreement and 2011 Kim NDA will not injure the public in any respect.

163.    Unless restrained by the Court, Kim will continue his unlawful acts.

164.    As a direct and proximate result of Kim's breaches, Orthobond sustained damages, including as described above.

165.    Defendants have breached their contracts with Orthobond as described above, resulting in significant financial and competitive harm to Orthobond, and, unless restrained form doing so, will continue to breach their contracts, resulting in additional and significant harm to Orthobond.

## PRAYER FOR RELIEF

WHEREFORE, Orthobond respectfully requests:

A.     that a judgment be entered that Defendants have wrongfully misappropriated Orthobond's trade secrets under the Defend Trade Secrets Act;

B.     that a judgment be entered that Defendants have wrongfully misappropriated Orthobond's trade secrets under the New Jersey Trade Secrets Act;

C.     that a judgment be entered that Defendants have engaged in unfair competition;

D.     that a judgment be entered that Defendants Burel, Clevenger, Donald and Kim have breached their respective contracts with Orthobond;

E.     an award of compensatory damages in an amount to be proven at trial;

F.     an award of royalty payments;

G.     an award of punitive or exemplary damages;

H.     an Order directing return of Orthobond's confidential and proprietary information, know-how and trade secret information;

I.     a permanent injunction restraining and enjoining Defendants and their respective officers, agents, servants, employees, and attorneys, and all persons in active concert or participation with each or any of them, from directly and indirectly committing, aiding, encouraging, enabling, inducing, causing, materially contributing to, or otherwise facilitating the ongoing misuse and misappropriation of Orthobond's confidential and proprietary information, know-how and trade secrets, as described in this action;

J.     an award of reasonable attorneys' fees and costs incurred by virtue of this action; and

K.     such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Orthobond respectfully demands a trial by jury on all issues triable by jury.


Date: January 18, 2022                              Respectfully submitted,

                                                    By: s/ Charles H. Chevalier
                                                    Charles H. Chevalier
                                                    Christine A. Gaddis
                                                    Rachel S. Johnston
                                                    **GIBBONS P.C.**
                                                    One Gateway Center
                                                    Newark, New Jersey 07102-5310
                                                    Telephone No.: (973) 596-4500
                                                    cchevalier@gibbonslaw.com
                                                    cgaddis@gibbonslaw.com
                                                    rjohnston@gibbonslaw.com

                                                    John D. Murnane
                                                    Alicia A. Russo
                                                    **VENABLE LLP**
                                                    1290 Avenue of the Americas, 20th Floor
                                                    New York, New York 10104
                                                    Telephone No.: (212) 218-2100
                                                    jmurnane@venable.com
                                                    arusso@venable.com

                                                    Jason M. Dorsky
                                                    **VENABLE LLP**
                                                    600 Massachusetts Avenue, NW
                                                    Washington, DC 20001
                                                    Telephone No.: (202) 344-4000
                                                    jmdorsky@venable.com

                                                    *Attorneys for Plaintiff*
                                                    *Orthobond Corporation*